IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

ROBIN LEE GARRISON,

      Plaintiff,

vs.

KEMIN INDUSTRIES, INC.,

      Defendant.

**No. 4:03-cv-40409-JEG**

**O R D E R**

This matter is before the Court on Defendant's Motion for Summary Judgment. Defendant moved for summary judgment on Plaintiff's claims on December 3, 2004. As a result of repeated requests for extensions of time in which to file responsive pleadings, the final reply was not filed until March 3, 3005. Hearing was held on the motion on April 1, 2005. Attorneys Kelly Baier and Elizabeth Nelson appeared for Defendant, and attorney Michael Carroll appeared for Plaintiff. The matter is now fully submitted and ready for ruling. For the reasons discussed below, Defendant's Motion for Summary Judgment must be granted.

## I. FACTS

Plaintiff Robin Garrison ("Garrison") was hired by Dr. Chris Nelson ("Dr. Nelson"), President of Defendant Kemin Industries, Inc. ("Kemin"), on August 28, 2000. At that time, Garrison was 45 years old. Garrison was hired by Kemin to act as the General Manager of Kemin.com, Kemin's internet service website.

During the fall of 2001, Kemin's management received complaints about Garrison's work performance and conduct from Jody Montgomery, Kemin's Information Technology Support Manager, via email, and from Brenda Friedrich and Kathy Becker, two employees who were supervised by Garrison, via performance reviews they were required to complete on Garrison.  Dr. Nelson and Mark Scantlin ("Scantlin"), the Human Resources Director for Kemin, interviewed Friedrich and Becker and investigated their allegations.  Other employees were also interviewed; the information obtained from these employees corroborated the allegations of Becker and Friedrich.  Dr. Nelson and Scantlin determined that the allegations of Becker and Friedrich against Garrison were supported by the facts.

Dr. Nelson and Scantlin then met with Garrison to inform him of their findings and to provide him with the opportunity to explain his actions.  At the end of this meeting, Dr. Nelson gave Garrison the opportunity to resign or to remain with Kemin provided Garrison would agree to meet certain conditions.  Garrison was advised by Dr. Nelson and Scantlin that if he was to remain employed with Kemin, he would have to apologize to Friedrich and Becker and significantly improve his work performance.  Garrison was also advised that if there were any additional problems with his performance, he would be immediately terminated.  Garrison challenges the accuracy of the allegations and argues the discipline was unfair or based on inaccurate

2

information.  He asked for a further and deeper investigation than had already been conducted.  Garrison states that Scantlin refused to conduct a further investigation because Scantlin believed the incident had been isolated and contained.

Garrison chose not to resign and agreed to remain at Kemin and abide by the conditions established by Dr. Nelson and Scantlin.  Scantlin prepared a memorandum outlining the terms and conditions of Garrison's continued employment at Kemin and provided a copy of that memorandum to Garrison.  Garrison signed the memorandum acknowledging that if he did not significantly change, he would be terminated from his employment with Kemin.

In the fall of 2001, Dr. Nelson worked with other Kemin management and determined that the information technology work of the company should be reorganized.  Dr. Nelson worked specifically with Garrison on the development of a new position, World Wide Information Technology Director for Kemin.  In April 2002, Dan Heiderscheit ("Heiderscheit") was hired as Kemin's World Wide Information Technology Director.  In May of 2002, Dr. Nelson further reorganized the IT work of Kemin, and as a result Garrison reported to Heiderscheit.

Kemin contends that Garrison continued to fail to perform his job at a satisfactory level.  Garrison disputes this contention, stating that he performed all tasks requested of him, communicated with Heiderscheit and Dr. Nelson constantly about

3

his projects, and was never specifically told that he was not completing tasks either in a timely or complete manner.  In mid-July of 2002, Montgomery reported to Heiderscheit that Garrison had referred to Heiderscheit as a "prick" or an "asshole". Garrison denies this and argues that Kemin's story regarding what exact language was used has changed several times since the date of his termination.

Kemin states that Heiderscheit advised Dr. Nelson that Garrison was continuing to perform unsatisfactorily and that he was being insubordinate to Heiderscheit. Garrison disputes this and claims that not only was he not being insubordinate, he believed at the time he was being discriminated against by Heiderscheit based on his age, and that he made several complaints about his concerns to Karen Nelson, who was the President of Kemin and Dr. Nelson's wife.

Kemin states that after being advised by Heiderscheit that Garrison was per-forming unsatisfactorily, Dr. Nelson reviewed Garrison's personnel file, the December 5, 2001, final written notice given to Garrison, and Garrison's recent work perfor-mance.  Upon reviewing and considering this information, Dr. Nelson decided to terminate Garrison's employment.  Garrison disputes this and contends that the record shows Dr. Nelson and Scantlin each testified that they were the one who made the decision to terminate Garrison's employment with Kemin.

Garrison filed timely complaints with the Iowa Civil Rights Commission and the Equal Opportunity Employment Commission, contending that he had been subject to discrimination due to his age.  Garrison obtained right-to-sue letters from each organization.

On July 25, 2003, Garrison filed suit in this Court, asserting two counts of age discrimination, one arising under the Iowa Civil Rights Act and one under the Age Discrimination in Employment Act.  Garrison also asserted a claim of wrongful termination in violation of public policy.  Kemin responded to Garrison's complaint by denying all the allegations contained therein and asserted a counterclaim for a $5,000 loan it claims it made to Garrison that Garrison allegedly failed to repay.

On December 3, 2004, Kemin moved for summary judgment on all claims, including its counterclaim.  Kemin contends that the undisputed facts cannot support a reasonable inference that Garrison was terminated or otherwise faced any adverse employment action because of his age, and that Garrison cannot establish a prima facie case of age discrimination because he cannot present facts proving he was meeting the legitimate expectations of his employer.  Kemin also asserts that judgment as a matter of law should be granted to Kemin on its counterclaim for the repayment of monies it loaned to Garrison, arguing that because Garrison failed to reply to Kemin's counterclaim and failed to timely respond to Kemin's request for admissions,

5

Garrison has admitted that while employed by Kemin, he received a loan from Kemin

in the amount of $5,000 and that he has not repaid this loan.  Garrison resists

Kemin's motion for summary judgment, stating that genuine issues of material

fact exist.

## II.  APPLICABLE LAW AND DISCUSSION

### A.    Standard of Review

"[C]laims lacking merit may be dealt with through summary judgment under

Rule 56."  Swierkiewicz v. Soreman, 122 S. Ct. 992, 998-999 (2002).  Summary

judgment is a drastic remedy, and the Eighth Circuit has recognized that it "must be

exercised with extreme care to prevent taking genuine issues of fact away from

juries."  Wabun-Inini v. Sessions, 900 F.2d 1234, 1238 (8th Cir. 1990).  "The

judgment sought shall be rendered forthwith if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to

a judgment as a matter of law."  Fed. R. Civ. P. 56(c)).  See also Celotex Corp. v.

Catrett, 477 U.S. 317, 322-23 (1986); Herring v. Canada Life Ins. Co., 207 F.3d

1026, 1029 (8th Cir. 2000).  Summary judgment should seldom be granted in

employment cases.  Barrett v. City of Minneapolis, 211 F.3d 1097 (8th Cir. 2000).

The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." Hartnagel v. Norman, 953 F.2d 394, 395 (8th Cir. 1992) (citing Celotex, 477 U.S. at 323); see also Shelter Ins. Co. v. Hildreth, 255 F.3d 921, 924 (8th Cir. 2001); McGee v. Broz, 251 F.3d 750, 752 (8th Cir. 2001). Once the moving party has carried its burden, the opponent must show that a genuine issue of material fact exists. Nat'l Bank of Commerce of El Dorado, Ark. v. Dow Chem. Co., 165 F.3d 602, 607 (8th Cir. 1999). The Court gives the nonmoving party the benefit of all reasonable inferences and views the facts in the light most favorable to that party. de Llano v. Berglund, 282 F.3d 1031, 1034 (8th Cir. 2002); Pace v. City of Des Moines, 201 F.3d 1050, 1052 (8th Cir. 2000); Prudential Ins. Co. v. Hinkel, 121 F.3d 364, 366 (8th Cir. 1997).

"Summary judgment is proper if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law." Shelton v. ContiGroup Companies, Inc., 285 F.3d 640, 642 (8th Cir. 2002) (citing Henerey v. City of St. Charles, 200 F.3d 1128, 1131 (8th Cir. 1999). Summary judgment should not be granted if the Court can conclude that a reasonable trier of fact could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

7

248 (1986); Burk v. Beene, 948 F.2d 489, 492 (8th Cir. 1991).  In light of these

standards, the Court considers the present motion.

**B.     ADEA Discrimination Claim**

"The ADEA makes it unlawful for an employer to discriminate against an

employee on the basis of the employee's age if the employee is 40 years of age or

older."  Hitt v. Harsco Corp., 356 F.3d 920, 924 (8th Cir. 2004); see also 29

U.S.C.A. § 631.

> The plaintiff must first establish a prima facie case that the defendant
> violated the statute.  To make such a case under the ADEA, the plaintiff
> must ordinarily show that: (1) he is a member of a protected age group;
> (2) he was performing his job at a level that met his employer's legiti-
> mate expectations; (3) he was discharged; and (4) he was replaced by a
> younger worker.

Hitt, 356 F.3d at 924.  There is no dispute that Garrison is a member of a protected

group, as he is over the age of forty, and there is no dispute that Kemin terminated

Garrison's employment.  Garrison and Kemin disagree as to whether Garrison was

performing his job at a level that met Kemin's legitimate expectations and whether

Garrison was replaced by a younger worker.

Garrison asserts that in December 2001 he was placed on a performance plan

and did fine, and that there was nothing wrong with his performance until the day he

was fired.  As evidence to support his assertion he was meeting Kemin's legitimate

8

expectations, Garrison refers the Court to his own belief that he was performing his job satisfactorily.  Garrison also refers to a series of emails in the record that he claims demonstrates he was performing his job adequately.  These emails demonstrate nothing, as they are merely back and forth communication between Garrison, Heiderscheit, and Dr. Nelson regarding progress on a SmartNotes document they were developing.  Garrison maintains that there is at least a question of fact regarding whether he met Kemin's legitimate employment expectations.

Kemin asserts that Garrison was not performing his job at a level that met Kemin's expectations.  It is undisputed that management received complaints about Garrison's work performance and conduct from both Kathy Becker and Brenda Friedrich via the performance reviews they completed.  In addition, in November of 2001 Montgomery complained to Dr. Nelson about Garrison's attitude toward work. Dr. Nelson and Scantlin met with Garrison to discuss the issues raised by Becker and Friedrich and placed Garrison on final warning in December of 2001.  The final warning advised Garrison that if he did not show an overall improvement immediate termination could occur, and that if at any time a serious management-related incident occurred termination would occur immediately.  Garrison signed the written warning and acknowledged that his employment with Kemin was in severe jeopardy, that he

must show a significant change in his work attitude and management practices, and that if he did not make a significant change he would be terminated immediately.

Kemin states that Garrison continued to have problems with his performance throughout 2002 and became insubordinate to his supervisor in the summer of 2002. On July 22, 2002, Montgomery emailed Heiderscheit, again expressing concern about Garrison's attitude in the workplace.  Montgomery indicated that ever since Heiderscheit began his employment with Kemin, an attitude change in Garrison developed, with constant complaining from Garrison about the IT department.  Montgomery also stated in his email that although Garrison complained of being swamped with work, every time Montgomery saw him at the office Garrison was walking around doing nothing.  Montgomery advised Heiderscheit that Garrison referred to Heiderscheit as an asshole or a dick, or something to that effect.  Montgomery further stated that none of his own support team wanted to work with Garrison due to Garrison's lack of a team attitude, and that his team had requested on multiple occasions that Garrison provide passwords for software so that they could conduct configuration and monitoring, yet Garrison never provided the requested passwords.

Garrison's attitude toward Heiderscheit is evidenced by his response to an email Heiderscheit sent to him asking for an update on various issues relating to a SMARTNotes project.  Garrison responded by stating,

10

> Surely you did not really expect me to be able to do all of this in one
> day!  I already had a very full schedule for today and I do not believe
> that it is realistic or reasonable for you to make this kind of demand.
> Once again this comes down to resources and I really think you had a
> great deal of responsibility in creating our current situation.  If you had
> not delayed our hiring of staff months ago we would not be in this
> situation today.  However that said I will do the best I can . . .

(Garrison App. p. 277.)

Garrison does not dispute that Becker and Friedrich complained about him and
that he was subsequently placed on a final warning.  The email communications from
Montgomery which complained about Garrison's conduct speak for themselves.
Garrison's own response to Heiderscheit's request for a project status update evi-
dences somewhat of a negative attitude toward Heiderscheit.  Asserting that he was
doing fine without providing support in the record is insufficient, and simply claiming
that a fact issue exists is not enough.  Garrison has failed to present facts that support
his contention that he was meeting the legitimate expectations of Kemin.

Assuming Garrison could show that he was meeting the legitimate expectations
of Kemin, in order to establish his prima facie case Garrison would also need to show
that he was replaced by a younger worker.  Garrison claims that in October 2002
Kemin hired a much younger person to replace him as the Internet Services Manager.
Garrison cites to the depositions of Scantlin and Heiderscheit to support this assertion

but fails to cite to the specific portions of the depositions upon which he relies.[1]  The

Court's necessary review of Scantlin's deposition did not produce the claimed record

support.  Scantlin testified,

> Q.   In fact, do you know who replaced Robin Garrison, who took
>       his duties?
> A.   I wouldn't say any one person took his duties.
> Q.   Was a woman named Kim hired after – shortly after Robin
>       was fired?
> A.    No.  Robin – His – I guess his core function was kind of dissolved,
>       but was spread out to different functions or different responsibilities
>       around the company.  We did hire someone after that.
> Q.   Do you know who that was?
> A.   Holly Kilborn, I believe.
> Q.   Do you know how old Holly is, or was, at the time she was hired?
> A.   I did, just because of the I-9, but I can't recall now.
> Q.   Under 40?
> A.   I would speculate she was probably under 40.

(Plaintiff's App. p. 23, Scantlin depo. pp. 33-34, ll. 12-5.)  Heiderscheit testified

as follows:

> Q.   After Robin was fired, how were his duties reassigned?
> A.   The team was totally dismantled because we didn't need the focus
>       on that area of the company anymore, so some of the website stuff
>       was given to an internet services team.  Some of the CRM projects,
>       CARDS projects were given to a projects team, different managers.
>       And those – Well, those are his three main duties, so they were
>       divided and put into teams based on the resources of the
>       IT department.
> Q.   Is there a person named Jeff in the IT Department?

---

[1] This fails to comply with the requirements of L. R. 56.1(b).

A.   Jeff Badger.
Q.   And what was his title back then?
A.   At the time Robin was terminated?
Q.   Yes.
A.   He was Worldwide IT Projects Manager.
Q.   Did he get any of Robin's duties?
A.   Yes.
Q.   How old is Jeff?  Do you know?
A.   I don't know his age.
Q.   Under 40 or over 40?
A.   I don't even want to guess.
Q.   I'm not very good at guessing either.  Holly – What is Holly's
     last name?
A.   Kilborn, I believe.
Q.   How do you spell Kilborn?
A.   K-i-l-b-o-r-n.
Q.   Was Ms. Kilborn hired after Mr. Garrison was fired?
A.   Yes, she was.
Q.   And did she take over any of the duties that Robin was handling
     before his termination?
A.   A part of them.
Q.   And do you know what Ms. Kilborn's age is?
A.   No, I don't.

(Plaintiff's App. pp. 29-30; Heiderscheit depo. pp.16-18, ll. 17-10.)  The testimony

of Scantlin and Heiderscheit demonstrates that after Garrison was terminated from

employment he was not replaced by a younger worker; rather, his position was

dissolved, and his duties were absorbed by several different people.  At most,

Garrison has Scantlin's *speculation* that Holly Kilborn, who was hired at a later time

and took over some, but not all, of Garrison's duties, is *possibly* under the age of 40.

This information is insufficient to create a genuine issue that Garrison was replaced by

13

a younger worker.  Thus, even assuming in the light most favorable to Garrison that he was performing his job at a level that met his employer's legitimate expectations, Garrison has not established that he was replaced by a younger worker.  Garrison can not establish his prima facie case that Kemin violated the ADEA.

Garrison contends that he can produce direct evidence of discrimination.  "The direct evidence required to shift the burden of proof is evidence of conduct or statements by persons involved in making the employment decision directly manifesting a discriminatory attitude, of a sufficient quantum and gravity that would allow the fact-finder to conclude that attitude more likely than not was a motivating factor in the employment decision."  Erickson v. Farmland Industries, Inc., 271 F.3d 718, 724 (8th Cir. 2001).  Garrison has failed to produce such evidence.

Assuming arguendo Garrison could establish his prima facie case, the burden would shift to Kemin to produce a legitimate, nondiscriminatory reason for terminating Garrison's employment.  Hesse v. Avis Rent A Car Sys., Inc., 394 F.3d 624, 631 (8th Cir. 2005).  Kemin states that Garrison was terminated from employment due to substandard performance, misconduct towards fellow employees, and his insubordination to Heiderscheit.  Kemin has articulated a legitimate, nondiscriminatory reason for terminating Garrison's employment.

> If the employer provides a non-discriminatory reason, the presumption
> of discrimination disappears, and the plaintiff can only avoid summary
> judgment if he or she presents evidence that considered in its entirety,
> (1) creates a question of material fact as to whether the defendant's
> proffered reasons are pretextual and (2) creates a reasonable inference
> that age was a determinative factor in the adverse employment decision.

Kohrt v. MidAmerican Energy Co., 364 F.3d 894, 897 (8th Cir. 2004).  In support of

his contention that a question of material fact exists regarding whether Kemin's

proffered reason was pretextual, Garrison first claims that whether Heiderscheit relied

on Montgomery's claim that Garrison called him an asshole or a dick in deciding to

terminate Garrison's employment is a fact question.  The record shows that Heider-

scheit did consider this alleged name-calling.  Heiderscheit's July 23, 2002, memo to

Scantlin, in laying out the reasoning behind terminating Garrison's employment, states,

> This is to document the issues that have lead me to decide to terminate
> Robin Garrison, General Manager Internet Services, from Kemin
> Industries.  I reviewed Robin's personnel file in which I found that
> Robin had previously been written up on issues that are considered to be
> inappropriate behavior for an employee at his level in the company and
> had taken place before I was employed with Kemin.
>
> I had repeatedly asked Robin to complete a resource plan for myself on
> the members of his team and a Functional Requirements Document for
> Chris Nelson.  Neither of the documents were completed and the FRD
> was of a critical nature for the Senior Executives of Kemin Industries.
> After repeated counseling by myself, Robin's direct supervisor, on
> failure to complete assigned tasks on time, Robin and I met to discuss
> the issue.

> Robin also used profanity and vulgar expressions about myself to
> another coworker of his.  This type of behavior is unacceptable by me
> for a senior level manager.  I consider this highly unprofessional and
> completely inappropriate behavior in Kemin.

> Based on this information I have decided to terminate Robin Garrison.

(Plaintiff's App. p. 227.)  Heiderscheit's memo indicates there were overriding performance concerns that were the primary reason for decision to fire Garrison, and it is clear that the alleged use of profanity was deemed unprofessional and was also taken into consideration by Heiderscheit.  Heiderscheit himself testified that although this alleged name-calling was not directly considered, it was indirectly considered as it showed that Garrison was going downhill and resorted to calling people names in a business setting.  Heiderscheit reiterated that this was not the main reason for the decision to terminate Garrison's employment.  Thus, there is no factual dispute regarding whether the alleged use of profanity was a reason relied on in making the decision to terminate Garrison's employment; Heiderscheit's own memo and deposition testimony shows that it was taken into consideration.

Garrison states that the allegation that the name-calling came to Heiderscheit's attention as second-hand news seems too flimsy to believe and asserts that Kemin has changed its story multiple times regarding what Garrison allegedly called Heiderscheit.  Garrison's own Appendix contains a copy of the email dated July 22, 2002, in which

Montgomery informed Heiderscheit of this alleged name-calling.  (See Plaintiff's
Appendix, p. 262).  Montgomery informed Heiderscheit that there were problems with
Garrison, and with regards to the name-calling Montgomery wrote, "The question was
onced [sic] asked how he liked you and his response was *something of the effect of I
think he's an 'a@@hole' or 'di@#.'*"  Clearly, in sharing this with Heiderscheit,
Montgomery was not conveying that he was accurately quoting Garrison but rather
was attempting to give Heiderscheit a more general idea of the nature of the com-
ments Garrison was making.  In any event, the fact that Heiderscheit was made aware
of this alleged name-calling fails to create a genuine issue of material fact regarding
whether Kemin's proffered reason for Garrison's termination was dishonest and
merely a pretext.[2]

Garrison also points to the negative performance review he performed on
Heiderscheit in early July 2002 to establish that Kemin's proffered reason for his
termination was pretextual.  Garrison questions why Scantlin and Dr. Nelson did not
treat the performance review Garrison performed on Heiderscheit the same way they
had treated the performance reviews Becker and Friedrich completed on Garrison.

---

[2] The fact of the use of foul or at least unprofessional terms in these circum-
stances provides one basis for an adverse employment action.  Plaintiff's effort to
generate a fact issue over a dispute of the specific terms used is, at best, collateral.

Garrison asserts that the failure to treat Garrison's review of Heiderscheit in the same manner as they treated the reviews by Becker and Friedrich of Garrison gives rise to a reasonable inference of discrimination or retaliation.  In confronting the performance reviews of Becker and Friedrich, Kemin had two employees who were making very similar complaints about their superior.  In addition, Dr. Nelson had received an email from Montgomery during the same timeframe that similarly complained about Garrison's conduct and corroborated the complaints of Becker and Friedrich.  In contrast, when Kemin received Garrison's performance review of Heiderscheit, there were no other complaints about Heiderscheit, and it was known that Garrison had an attitude problem toward Heiderscheit, presumably because Garrison had applied for the World Wide Information Technology Director position and Kemin hired Heiderscheit into that position instead of Garrison.

Garrison contends that a contradiction in the record exists regarding who made the decision to fire Garrison and that this contradiction creates a factual dispute for the jury to resolve.  The record is not in conflict regarding who made the ultimate decision to terminate Garrison's employment.  The record clearly shows that Heiderscheit, Garrison's immediate supervisor, recommended to Scantlin in a letter dated July 23, 2002, that Garrison be terminated from employment.  Heiderscheit testified that Dr.

Nelson made the ultimate decision to terminate Garrison's employment after Heiderscheit made his recommendation that Garrison be fired.

Dr. Nelson also testified that Heiderscheit made a recommendation that Garrison be terminated.  Dr. Nelson testified that normally Heiderscheit could have made the ultimate decision to fire Garrison; however, due to Dr. Nelson's involvement in placing Garrison on final warning in December of 2001, Dr. Nelson had the final decision on the termination of Garrison's employment.  In addition, Kemin noted at hearing that because Heiderscheit was still relatively new on the job, Dr. Nelson took it upon himself to make the final decision on Garrison's termination.

Scantlin's testimony further corroborates the testimony of Dr. Nelson and Heiderschiet.  Scantlin testified that Heiderscheit approached him in late July and indicated that there were several performance issues pertaining to Garrison and that Heiderscheit wanted to terminate Kemin's employment relationship with Garrison. Scantlin then consulted with legal counsel for Kemin regarding the termination. Scantlin testified that he asked Heiderscheit to review all the information in Garrison's file and stated that he knew Heiderscheit was going to confer with Dr. Nelson and go over the file information with him, including the information Scantlin obtained from Kemin's legal counsel.  Scantlin has never contended he made the decision to fire Garrison.  He simply indicated that once the final decision was made, he was the

19

person who communicated the decision to Garrison; hence, he was the one who verbally communicated the termination decision to Garrison.

Garrison has failed to present sufficient evidence to create a question of material fact as to whether Kemin's proffered reason for its employment decision was pretextual.

Even if Garrison could establish that Kemin's proffered reason for terminating his employment was dishonest, he would also need to show that the explanation was a pretext for age discrimination.  Kohrt, 364 F.3d at 898; Spencer v. Stuart Hall Co., Inc., 173 F.3d 1124, 1128 (8th Cir. 1999).  "It is not enough, in other words, to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination."  Hicks v. St. Mary's Honor Ctr., Div. of Adult Inst. of Dept. of Corr. & Human Res. of State of Mo., 2 F.3d 265, 266 (8th Cir.) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 519 (1993)).  To satisfy this burden, Garrison asserts that statements made by Heiderscheit provide evidence of age discrimination.  Garrison asserts that Heiderscheit often referred to the younger IT employees as the "young guns".  Garrison also claims that Heiderscheit made the comment to him, "Can't an old dog learn new tricks?", a statement he claims Heiderscheit made when Garrison did not know how to use a particular piece of software.  Heiderscheit denies that he ever made this comment to Garrison.  Even

20

assuming in the light most favorable to Garrison that Heiderscheit did in fact make

that comment in reference to Garrison, it would amount to nothing more than a stray

remark.  "Stray remarks made in the workplace are not sufficient to establish a claim

of discrimination."   Simmons v. Oce-USA, Inc., 174 F.3d 913, 915 (8th Cir. 1999).

Further, describing the employees who were in fact younger as "young guns" is an

accurate description which amounts to nothing more than a stray remark.  Merrick v.

Farmers Ins. Group, 892 F.2d 1434, 1438-39 (9th Cir. 1990) (comment that another

individual was selected for employment because he was "a bright, intelligent,

knowledgeable young man" is a stray remark).

Garrison cannot establish his prima facie case.  Further, Kemin has offered a

legitimate, nondiscriminatory reason for choosing to terminate Garrison's

employment, and Garrison is unable to demonstrate that a genuine issue exists

regarding whether Kemin's proffered reason for this employment decision was a

pretext for unlawful age discrimination.  Defendant's Motion for Summary Judgment

must be granted.

## C.    ADEA Retaliation Claim

Garrison contends that he was fired in retaliation for complaints he claims to

have made to Karen Nelson about age discrimination.  To establish a prima facie case

of retaliation, Garrison must show that he participated in a protected activity, that

21

Kemin took an adverse employment action against him, and that a causal connection

exists between the two.  Calder v. TCI Cablevision of Missouri, Inc., 298 F.3d 723,

731 (8th Cir. 2002).

Opposing or complaining of discriminatory treatment is a protected activity.

See Wentz v. Maryland Cas. Co., 869 F.2d 1153, 1155 (8th Cir. 1989) ("[c]onduct

protected under the ADEA includes opposing ongoing discriminatory treatment").

Karen Nelson died shortly after Garrison was terminated; thus, other than Garrison's

own self-serving claims that he made complaints to Karen Nelson, there is nothing in

the record that shows Garrison ever made complaints to Karen Nelson or anyone else

at Kemin that he was being discriminated against based on his age.  Dr. Nelson and

Scantlin both testified that Karen Nelson never advised them that she had received

any complaints from Garrison regarding any age discrimination.  Assuming in the light

most favorable to Garrison that he did make such complaints to Karen Nelson, and

that those who participated in the decision to terminate his employment were made

aware of those complaints, Garrison would need to establish a causal connection

between those complaints and his termination.  There is no evidence in the record

demonstrating a causal connection between these alleged complaints and Garrison's

termination from employment.  Garrison has failed to establish his prima facie case

of retaliation.

**D.**     **ICRA Age Discrimination and Retaliation Claims**

"The ICRA is interpreted to mirror federal law, including the ADEA." <u>Fisher</u>

<u>v. Pharmacia & Upjohn</u>, 225 F.3d 915, 919 n.2 (8th Cir. 2000).  Where a plaintiff

does not present separate arguments under the ICRA, state civil rights claims are

addressed together with Title VII claims.  <u>Hannoon v. Fawn Eng'g Corp.</u>, 324 F.3d

1041, 1046 (8th Cir. 2003) (citing <u>Iowa State Fairgrounds Sec. v. Iowa Civil Rights</u>

<u>Comm'n</u>, 322 N.W.2d 293, 296 (Iowa 1982)) (federal cases persuasive in selecting

the analytical framework for deciding discrimination cases under the ICRA); <u>see also</u>

<u>Mercer v. City of Cedar Rapids</u>, 308 F.3d 840, 846 n.2 (8th Cir. 2002).  Because

Garrison's claims under Iowa Code § 216 are premised on the same factual bases as

his ADEA claims, they must also fail.

**E.**     **Wrongful Discharge in Violation of Public Policy**

Garrison alleges in his Complaint that Kemin violated public policy, as defined

in Iowa Code Chapter 216, by terminating him after he complained that he was

subject to age discrimination during his employment.  The Iowa Supreme Court has

held that Iowa Code Chapter 216 is the exclusive remedy for claims of discrimination.

<u>Channon v. United Parcel Serv.</u>, 629 N.W.2d 835, 858 (Iowa 2001); <u>Westin v.</u>

<u>Mercy Med. Servs.</u>, 994 F.Supp. 1050, 1056 (N.D. Iowa 1998); <u>Borschel v. City of</u>

<u>Perry</u>, 512 N.W.2d 565, 567-68 (Iowa 1994); <u>Grahek v. Voluntary Hosp. Coop.</u>

Ass'n of Iowa, Inc., 473 N.W.2d 31, 34 (Iowa 1991); Vaughn v. AG Processing, Inc., 459 N.W.2d 627, 638 (Iowa 1990); Northrup v. Farmland Indus., Inc., 372 N.W.2d 193, 197 (Iowa 1985).  Only where statutory claims are found to be "separate and independent" of common law claims will a plaintiff be allowed to maintain a common law claim in addition to ICRA claims.

In this case, Plaintiff's public policy claim is identical to his statutory claims. "Preemption occurs unless the claims are separate and independent, and therefore incidental, causes of action."  Channon, 629 N.W.2d at 857; Thompto v. Coborn's Inc., 871 F.Supp. 1097, 1109 (N.D. Iowa 1994); Greenland v. Fairton Corp., 500 N.W.2d 36, 38 (Iowa 1993) (citing Grahek, 473 N.W.2d at 34).  In order for Garrison to be successful on his claim of violation of public policy, he must prove that he was terminated solely due to his alleged complaints about Kemin's alleged dis-criminatory behavior.  This is the same thing that Garrison must prove in order to be successful on his statutory claims, and therefore the claims are not separate and independent.  "The claims are not separate and independent when, under the facts of the case, success on the claim not brought under chapter 216 requires proof of discrimination."  Thompto, 871 F. Supp. at 1109.  See also Channon, 629 N.W.2d at 857.  Garrison must necessarily prove that his termination was wrongful.  Here that means he must prove his termination was due to age discrimination.  Garrison's claims

24

are not separate and independent; therefore, his statutory claim preempts his public policy claim.  Indeed, Garrison conceded in his resistance to Kemin's motion for summary judgment that he has no claim for wrongful termination in violation of public policy.

**F.**      **Kemin's Counterclaim**

Kemin also requests summary judgment on its counterclaim for repayment of monies allegedly loaned to Garrison by Kemin.  Kemin contends that by failing to reply to Kemin's counterclaim and by failing to timely respond to Kemin's request for admissions, Garrison has admitted that while employed by Kemin, he received a loan from Kemin in the amount of $5,000 and that he has not repaid this loan.

Garrison does not contest that he has failed to respond to Kemin's counterclaim and the request for admissions.  Garrison asserts that nevertheless there are enough questions about the intent of the parties when Kemin gave him the $5,000 that summary judgment should not be granted.  Garrison states in his Declaration that the $5,000 was not a loan at all, but instead it was used to secure a credit card so that he could travel.  Garrison further states that there was no loan agreement, written or oral, for him to repay the $5,000, and that the issue never came up until after he was fired. Garrison requests that he be allowed to amend his answer and to respond to the admissions.

25

Rule 36 pertains to requests for admissions.  It states that a party may serve upon another party requests for admissions of the truth of certain facts which are relevant to the issues in the case.

> Each matter of which an admission is requested shall be separately set forth.  The matter is admitted unless, within 30 days after service of the request, or within such shorter or longer time as the court may allow or as the parties may agree to in writing, subject to Rule 29, the party to whom the request is directed serves upon the party requesting the admission a written answer or objection addressed to the matter, signed by the party or by the party's attorney.

Fed. R. Civ. P. 36(a).  Kemin served its request for admissions on Garrison on July 2, 2004.  Garrison served upon Kemin his written answer on December 2, 2004.  The parties did not agree to a time-frame longer than that allowed by Rule 36(a), nor did the court authorize such an extended time-frame.  The matters set forth in Kemin's July 2, 2004, request for admissions are therefore deemed admitted under the rule.

By operation of Rule 36(a), Garrison admitted that while employed by Kemin, he received a loan from Kemin in the amount of $5,000.00, that he has not repaid this loan to Kemin, and the loan is due and owing.  Based on these admissions, Kemin's Motion for Summary Judgment on its counterclaim is granted.

### III.  CONCLUSION

The Court finds there is no genuine issue of material fact on the essential claims and that judgment should be entered in favor of Kemin as a matter of law as to

26

Garrison's Complaint.  Defendant's Motion for Summary Judgment [Clerk's No. 10] must be **granted.**

The Court finds that as a result of Garrison's Rule 36(a) admissions, there is no genuine issue of material fact on Kemin's counterclaim.  Counterclaim Plaintiff Kemin's Motion for Summary Judgment as to its counterclaim [Clerk's No. 10] must be **granted**.  The Court directs the Clerk of Court to enter judgment against the Plaintiff and in favor of the Defendant on the Plaintiff's claims, together with costs. The Court further directs the Clerk of Court to enter judgment on the counterclaim against Robin Lee Garrison in favor of Kemin Industries, Inc., in the amount of $5,000.00, together with interest as provided by law.

   **IT IS SO ORDERED.**

   Dated this 11th day of April, 2005.

JAMES E. GRITZNER, JUDGE
UNITED STATES DISTRICT COURT